UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
JOSEPH EBANKS, Individually and on Behalf :    Civil Action No. 1:20-cv-00453
of All Others Similarly Situated,    :
     :    <u>CLASS ACTION</u>
           Plaintiff,    :
     :    COMPLAINT FOR VIOLATION OF THE
    vs.    :    COMMODITIES EXCHANGE ACT,
     :    VIOLATION OF THE SHERMAN
IFINEX INC., BFXNA INC., TETHER    :    ANTITRUST ACT, UNJUST ENRICHMENT
HOLDINGS LIMITED, TETHER LIMITED,    :    AND INJUNCTIVE RELIEF
TETHER OPERATIONS LIMITED,    :
DIGFINEX INC., JEAN-LOUIS VAN DER    :
VELDE, GIANCARLO DEVASINI and    :
PHILIP POTTER,    :
     :
           Defendants.    :
     :
———————————————————— x    <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Joseph Ebanks ("plaintiff") alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation of plaintiff's counsel, which included, among other things, a review of relevant court filings involving and media and analyst reports about iFinex Inc., BFXNA Inc., and BFXWW Inc. (collectively, "Bitfinex"), and Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited (collectively, "Tether"), including court filings in the action filed by the New York Attorney General against Bitfinex and Tether in New York Supreme Court, styled *In the Matter of the Inquiry by Letitia James, Attorney General of the State of New York v. iFinex Inc., et al.*, Index No. 450545/2019 (the "NYAG Action").  Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be secured after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all purchasers of bitcoin from April 1, 2017 through the present (the "Class Period") asserting market manipulation claims under federal law. Defendants used their dual-roles as issuers of an influential cryptocurrency and the operators of a central cryptocurrency exchange to pump up one of the largest asset bubbles in history, allowing them to net hundreds of millions of dollars in illicit trading proceeds at artificially inflated prices in a market that they had manipulated.

2.      Cryptocurrencies are digital assets that use distributed ledger technology, such as a blockchain, to verify transactions.  Advocates of cryptocurrencies claim that the community verification process provides better security, tracking and integrity of transactions.  Most cryptocurrencies are decentralized, meaning they are not controlled by a central state or banking authority.

3.      Defendants own Tether, the issuer of the eponymous cryptocurrency.  Unlike most other cryptocurrencies, tether is not decentralized, but rather centrally controlled and managed.  Its issuance, operation, and maintenance lie solely within the hands of defendants and their associates.

4.      Tether is billed as a "stablecoin" because it is ostensibly designed to always be worth $1.  The benefit of a stablecoin is that it provides a medium of exchange for purchasing cryptocurrency assets that mitigates volatility by referencing assets outside of the cryptocurrency space.  For example, even if cryptocurrency markets plunge, tethers would ostensibly keep their 1-to-1 U.S. dollar, or USD, value ratio.  A stablecoin can also allow cryptocurrency traders to more efficiently trade between different tokens by avoiding a conversion in and out of USD.  Defendants described tethers as simply "fiat currencies on the Bitcoin blockchain."  Tether would ultimately grow to become the largest stablecoin and one of the largest cryptocurrencies of any type in circulation.

5.      In order to maintain the perception that a tether is always worth $1, defendants represented to investors that every tether in existence was backed by one USD.  Defendants claimed they would only issue tethers in response to investor demand and that investors would receive newly issued tethers for each dollar they paid to Tether.  These dollars would then be deposited in a secure reserve account backing the outstanding tethers.  As Tether claimed on its website, tethers were purportedly "backed 100% by actual fiat currency assets in [Tether's] reserve account" and "always maintains a one-to-one ratio with any currency held."  Investors were also told they could redeem their tethers in exchange for the same number of dollars pursuant to Tether's "guarantee of 100% redeemability."

6.      At the same time that defendants controlled Tether's operations, they also owned and operated Bitfinex, a cryptocurrency trading platform.  Bitfinex began as a peer-to-peer bitcoin trading platform and later added additional cryptocurrencies.

7.      Defendants' positions as issuers of the predominate stablecoin and operators of their own cryptocurrency exchange provided them with immense influence over cryptocurrency markets during the Class Period.  Cognizant of the unseemly conflicts of interests these dual positions posed, defendants initially attempted to conceal the relationships between Bitfinex and Tether, claiming the two operations were "completely segregated."  In truth, both companies were actually owned and operated by the same core group of insiders.  These included defendant Jean-Louis van der Velde, the Chief Executive Officer ("CEO") of both Tether and Bitfinex, defendant Giancarlo Devasini, their Chief Financial Officer ("CFO"), and defendant Philip Potter, their Chief Strategy Officer ("CSO").  The companies used the same banking relationships and comingled corporate assets, including assets purportedly earmarked for USD tether reserves.  The following organizational chart illustrates some of the interconnections between the two entities:



8.      Despite defendants' best efforts, the close interconnections between Tether and Bitfinex were exposed, in part, through the leak of documents from offshore legal services provider Appleby (colloquially dubbed the "Paradise Papers" leak) in November 2017.  Among other revelations, the Paradise Papers revealed that defendants Devasini and Potter had discretely established Tether in the British Virgin Islands in September 2014.

9.      Defendants' concealment was no accident, but part of a plot to manipulate trading in the largest and most lucrative cryptocurrency market: the bitcoin market.  Defendant Devasini presaged the scheme in 2012, when, writing under a pseudonym, he posted on a cryptocurrency website that the market for bitcoin was "easy prey to manipulation."  As he explained, one would simply need "to draw attention by buying a pretty big quantity (compared to the daily number being bought and sold) and once this attention is drawn, more and more people will start buying

trying to jump on the bandwagon and trying not to miss the train." Five years later defendants executed this plan to perfection, giving the bitcoin bandwagon a multi-billion dollar push.

10. The scheme worked as follows: Defendants created giant blocks of tethers worth tens of millions of dollars. These tethers would not be issued pursuant to investor demand, but rather created out of thin air for the purpose of artificially manipulating cryptocurrency prices. Next, defendants would place these tethers into accounts that they or their affiliates controlled on the Bitfinex platform. Defendants would then use these tethers to make massive bitcoin purchases often across other popular cryptocurrency exchanges, such as Poloniex and Bittrex, interjecting tens of millions of dollars in artificial demand into the bitcoin market. The purchase of large quantities of bitcoin drove up its price just as defendants specifically intended, creating upward price impacts. This upward pricing pressure was amplified by momentum trading effects in the highly speculative bitcoin market as other investors scrambled "not to miss the train." Defendants also timed their scheme to maximize its price effects, systematically propping up the price of bitcoin when the market began to sag or around pricing floors.

11. The magnitude of the scheme was enormous. Defendants created more than *$2.2 billion* worth of tether between March 2017 and January 2018 alone. The scheme placed a persistent upward pricing pressure on bitcoin causing the price to increase 19-fold, from approximately $1,000 per bitcoin in April 2017 to over $19,000 per bitcoin by the end of the year. At these artificially inflated prices, defendants cashed out by converting their bitcoin into USD, usually at month's end and in more discrete transactions in order to maintain the price inflation. Defendants could then use the USD for essentially any purpose they so desired, including self-dealing, inter-corporate transactions, or even to retroactively top up claimed tether cash reserves.

12.     In furtherance of the foregoing market manipulation scheme, defendants misrepresented the assets backing tether, the purpose of tether issuances, and the relationship between Bitfinex and Tether throughout the Class Period.  Defendants also made numerous false claims that they would release to investors a financial audit confirming claimed tether reserves. No such audit was ever publicly released, and there is no evidence one was ever undertaken.  The reasons are now obvious: the dollars are simply not there.  As Tether and Bitfinex would only later reveal in response to a lawsuit brought by the New York Attorney General ("NYAG"), hundreds of millions of USD are missing from tether accounts.  Indeed, ***defendants failed to even segregate any assets purportedly dedicated to tether USD reserves***, instead depositing proceeds from tether issuances into omnibus corporate slush funds.  These "sales" included the transfer of tethers to Bitfinex, where they could be converted to bitcoin or other currencies, or shuttled to accounts on other exchanges for the same purposes.  The central premise of tether – that the cryptocurrency is fully backed by USD – is a lie.  As is defendants' redemption "guarantee."  Investors have been effectively blocked from making any significant tether redemptions, further confirming that the true *raison d'être* for the tether issuances during the Class Period was defendants' own self-enrichment.

13.     Defendants' market manipulation scheme was a resounding success, and it contributed to one of the largest asset bubbles in history as illustrated by the following chart:



14.     In less than a year, the market for bitcoin grew by more than **$300 billion**. Approximately **half** of this historic bull run was directly attributable to defendants' market manipulation scheme.  As defendants' artificial price inflation dissipated, the bubble burst.  In January and February 2018 alone, the price of bitcoin plummeted more than 65%.  It continued to fall throughout 2018, ultimately dropping to little more than $3,000 per bitcoin by the end of the year.  These severe price declines wreaked financial havoc on investors.

15.     As a direct result of defendants' manipulation of the bitcoin market, plaintiff and the Class (defined below) suffered actual damages by transacting at artificial and unlawful prices for bitcoin.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to §22 of the Commodities Exchange Act ("CEA" or the "Act") (7 U.S.C. §25), 28 U.S.C. §§1331, 1332 and 1337(a).

17.     Venue is proper in this District pursuant to §22 of the CEA, 7 U.S.C. §25(c), 15 U.S.C. §22 and 28 U.S.C. §1391.  Defendants transacted business in this District during the Class

Period and the acts and transactions giving rise to the claims alleged herein occurred in part in this District.  In addition, a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

18.     This Court has personal jurisdiction over each defendant because each defendant was found or resided in this District, had agents in this District, or transacted business in this District; a substantial part of the events giving rise to plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  Although defendants claim to have limited access to U.S. based-investors for the purpose of tether redemptions, this only occurred several months into the Class Period and after defendants had *already* issued large sums of tethers to U.S.-based individuals.  In addition, defendants have continued to transact with U.S.-based individuals (including in this District) long after this purported limitation was put in place and billions of dollars' worth of tethers previously issued by defendants continue to be traded by U.S.-based investors unabated. Because defendants specifically targeted the market for bitcoin, a market dominated by U.S.-based investors, their scheme has caused U.S.-based investors disproportionate harm as they knew it would.

19.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

20.     Plaintiff Joseph Ebanks purchased bitcoins during the Class Period at prices that had been artificially inflated by defendants' manipulation of the market for bitcoin and as result suffered economic losses and actual damages.  Among other purchases, plaintiff purchased bitcoin on the following dates when the market for bitcoin was artificially inflated and distorted by

- 8 -

defendants' manipulative scheme and suffered actual damages, including the realization of financial losses attributable to purchasing bitcoin at such artificially inflated prices as follows:

(a)     On November 30, 2017, plaintiff purchased 0.20992172 bitcoins at USDT 9,167 per bitcoin.  By this point in the Class Period, defendants had issued more than 650 million tethers, artificially inflating the price of the bitcoins purchased by plaintiff by over $2,000.  More than $280 million worth of tethers was issued in the month of November 2017 alone directly proceeding plaintiff's purchase and contributing to the sustained price inflation that artificially inflated the price of plaintiff's purchase, causing him economic injury.

(b)     On December 16, 2017, plaintiff purchased 0.026 bitcoins at USDT 19,338 per bitcoin.  By this point in the Class Period, defendants had issued more than 1 billion tethers, artificially inflating the price of the bitcoins purchased by plaintiff by over $4,000.  More than $250 million worth of tethers was issued in the month of December 2017 alone directly proceeding plaintiff's purchase and contributing to the sustained price inflation that artificially inflated the price of plaintiff's purchase, causing him economic injury.

(c)     On December 19, 2017, plaintiff purchased 0.19442996 bitcoins at USDT 18,767 per bitcoin and 0.097704 at USDT 18,637 per bitcoin.  By this point in the Class Period, defendants had issued more than 1 billion tethers, artificially inflating the price of the bitcoins purchased by plaintiff by over $4,000.  More than $350 million worth of tethers was issued in the month of December 2017 alone directly proceeding plaintiff's purchase and contributing to the sustained price inflation that artificially inflated the price of plaintiff's purchase, causing him economic injury.

(d)     On December 20, 2017, plaintiff purchased 0.22670555 bitcoins at USDT 16,751 per bitcoin.  By this point in the Class Period, defendants had issued more than 1.1 billion

tethers, artificially inflating the price of the bitcoins purchased by plaintiff by over $4,000.  More than $400 million worth of tethers was issued in the month of December 2017 alone directly proceeding plaintiff's purchase and contributing to the sustained price inflation that artificially inflated the price of plaintiff's purchase, causing him economic injury.

(e)     On December 21, 2017, plaintiff purchased 0.133017 bitcoins at USDT 16,882.63 per bitcoin.  By this point in the Class Period, defendants had issued more than 1.1 billion tethers, artificially inflating the price of the bitcoins purchased by plaintiff by over $4,000.  More than $450 million worth of tethers was issued in the month of December 2017 alone directly proceeding plaintiff's purchase and contributing to the sustained price inflation that artificially inflated the price of plaintiff's purchase, causing him economic injury.

(f)     Plaintiff estimates his losses at more than $10,000 as a result of his bitcoin transactions during the Class Period, including realized financial losses on purchases at the artificially inflated prices specified above.

21.     Defendant iFinex Inc. ("iFinex") is incorporated in the British Virgin Islands and is the owner and operator of the Bitfinex cryptocurrency exchange.   It transacts with cryptocurrency traders, including US-based traders, through its subsidiaries, defendant BFXNA Inc. and BFXWW Inc.

22.     Defendant BFXNA Inc. ("BFXNA") is a wholly-owned subsidiary of iFinex that contracts with clients based in the United States, including in the State of New York.  iFinex's other subsidiary, BFXWW Inc., transacts with clients outside of the United States.  BFXNA is registered with the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCen") as a money transmitter.

23.     Defendant Tether Holdings Limited is the holding company for Tether Limited, Tether Operations Limited, and Tether International Limited, through which it issues digital tokens known as "tethers."

24.     Defendant Tether Limited is the issuer of tethers.  It is registered with FinCen as a money transmitter.

25.     Defendant Tether Operations Limited is responsible for processing transactions with Tether's U.S.-based investors, whereas Tether International Limited is responsible for processing transactions with Tether's non-U.S. based investors.

26.     Defendant DigFinex Inc. ("DigFinex") is the majority owner of iFinex and Tether, which, at various times during the Class Period, had employees located in New York and maintained accounts at two New York-based banks:  Signature Bank and Metropolitan Commercial Bank.

27.     Defendant Jean-Louis van der Velde ("van der Velde") was the CEO of Tether and Bitfinex during the Class Period.

28.     Defendant Giancarlo Devasini ("Devasini") was the CFO of Tether and Bitfinex during the Class Period.

29.     Defendant Philip Potter ("Potter") was the CSO of Tether and Bitfinex during the Class Period.  He also served as the U.S.-based liaison and executive for both companies.

30.     The defendants referenced above in ¶¶27-29 are collectively referred to herein as the "Individual Defendants."

31.     Defendants Tether Holdings Limited, Tether Limited, Tether Operations Limited, DigFinex, and the Individual Defendants are collectively referred to herein as the "Tether Defendants."

32.     Defendants iFinex, BFXNA, DigFinex, and the Individual Defendants are collectively referred to herein as the "Bitfinex Defendants."

## BACKGROUND

**The Bitfinex Platform**

33.     Bitfinex is an online platform for exchanging cryptocurrencies with headquarters variously identified as Hong Kong, China or Taiwan.  Its operations are decentralized and have been carried out in such diverse locations as the United States, the United Kingdom, Hong Kong, Switzerland, and Taiwan.

34.     Investors access the Bitfinex trading platform and place orders through its website, available at www.bitfinex.com.  Over ninety virtual currencies are listed for trading on the Bitfinex platform, including prominent virtual currencies like bitcoin and ether, as well as less well-known and thinly traded tokens.  Bitfinex earns money by, among other things, charging investors a fee for trades made on its platform.  The fee is a percentage of the amount of the trade.  As a result, the higher the price of bitcoin, the higher the fees paid to Bitfinex for every bitcoin traded on the platform.  Bitfinex also provides users with the ability to store their virtual currency and transfer their holdings to a different trading platform.

35.     Bitfinex is one of the relatively few virtual currency trading platforms that allow traders to deposit and withdraw fiat currency including USD, euros, pounds, and yen.  Traders using the Bitfinex platform can deposit USD with Bitfinex, convert this USD to virtual currency at the rates offered by Bitfinex, trade the virtual currency they have purchased, convert their virtual currency holdings back into dollars, and withdraw the funds.  Thus, it is important that Bitfinex has sufficient USD deposits on hand to fill withdrawal orders submitted by traders in a timely manner.

**The Tether "Stablecoin"**

36.     Tether began as a startup called Realcoin, which launched in 2014.  In November 2014, Realcoin was renamed "Tether" and its digital tokens rebranded as "tether."  Tether is a digital token issued by Tether Limited that trades under the symbol "USDT."

37.     Unlike bitcoin, which is decentralized, tether is centralized and its supply controlled by Tether insiders, namely the Individual Defendants.  Tether is billed as a stablecoin because it is purportedly pegged to a stable asset, in this case the U.S. dollar.  Since one tether is always supposed to be equal to one U.S. dollar, traders can theoretically use tethers to trade between different virtual currencies, or across different trading platforms, with minimal short-term price risk and without having to first convert to USD.  The perception of tether as being essentially equal to $1 was key to its appeal to investors and the maintenance of its market value.

38.     Tether is the largest stablecoin by market value, with over four billion tethers in circulation as of November 2019.  During the Class Period, tether was also the largest stablecoin used to purchase and redeem bitcoins, which provided defendants with enormous market power to influence the price of bitcoin by controlling the supply and perceived value of tethers.  While tether began with relatively modest volume, it has grown in substantial part due to defendants' market manipulation activities during the Class Period, as detailed herein, ultimately becoming the fourth largest cryptocurrency by market value and surpassing bitcoin as the most actively traded cryptocurrency.

39.     Defendants have marketed tether as pegged one-to-one to the U.S. dollar and fully backed by fiat reserves.  For example, defendants' June 2016 whitepaper[1] described tether as a

---

[1]     A whitepaper is an authoritative document that outlines the key concepts and designs of a particular product, service or idea.  Whitepapers are widely used by issuers to market and promote

"digital token backed by fiat currency" that "provides individuals and organizations with a robust and decentralized method of exchanging value while using a familiar accounting unit."  The whitepaper stated that Tether would "maintain a one-to-one reserve ratio between a cryptocurrency token, called tethers, and its associated real-world asset, fiat currency (USD)."  According to the whitepaper, "[t]ethers are fully reserved in a one-to-one ratio, completely independent of market forces, pricing, or liquidity constraints."  The whitepaper continued in pertinent part:

> Tethers may be redeemable/exchangeable for the underlying fiat currency pursuant to Tether Limited's terms of service or, if the holder prefers, the equivalent spot value in bitcoin.  Once a tether has been issued, it can be transferred, stored, spent, etc. just like bitcoins or any other cryptocurrency.  ***The fiat currency on reserve has gained the properties of a cryptocurrency and its price is permanently tethered** to the price of the fiat currency*.[2]

40.    Throughout the whitepaper, defendants highlighted the purported transparency and security of tethers and their underlying USD reserves.  Central to this transparency was Tether's promise to conduct "periodic audits by professionals" and to publish the company's bank balance on its website.  For example, the whitepaper stated that Tether "uses the bitcoin blockchain, Proof of Reserves, and other audit methods to prove that issued tokens are fully backed and reserved at all times."  It continued in pertinent part:

> At any given time the balance of fiat currency held in our reserves will be equal to (or greater than) the number of tethers in circulation.  This simple configuration most easily supports a reliable Proof of Reserves process; a process which is fundamental to maintaining the price-parity between tethers in circulation and the underlying fiat currency held in reserves.

*        *        *

> Each tether issued into circulation will be backed in a one-to-one ratio with the equivalent amount of corresponding fiat currency held in reserves by Hong Kong

---

currencies to investors, much like an offering prospectus may be used to market other types of investments.

[2]    Emphasis has been added throughout unless otherwise noted.

based Tether Limited.  As the custodian of the backing asset we are acting as a trusted third party responsible for that asset.  This risk is mitigated by a simple implementation that collectively reduces the complexity of conducting both fiat and crypto audits while increasing the security, provability, and transparency of these audits.

*       *       *

Tether's Proof of Reserves configuration is novel because it simplifies the process of proving that the total number of tethers in circulation (liabilities) are always fully backed by an equal amount of fiat currency held in reserve (assets).  In our configuration, each tether USD in circulation represents one US dollar held in our reserves (*i.e.*, a one-to-one ratio) which means the system is fully reserved when the sum of all tethers in existence (at any point in time) is exactly equal to the balance of USD held in our reserve.  Since tethers live on the bitcoin blockchain, the provability and accounting of tethers at any given point in time is trivial.  Conversely, the corresponding total amount of USD held in our reserves is proved by publishing the bank balance and undergoing periodic audits by professionals.

*       *       *

Tether has a simple and reliable Proof of Reserves implementation and undergoes regular professional audits.  Our underlying banking relationships, compliance, and legal structure provide a secure foundation for us to be the custodian of reserve assets and issuer of tethers.

41.    The below chart illustrates the relatively straightforward issuance and redemption cycle of tethers as portrayed by defendants:

- 15 -



42.     As would later be revealed, defendants' representation that tethers were backed one-to-one by USD held in reserve accounts was false.  At various points during the Class Period, defendants issued tethers in order to further the market manipulation scheme detailed herein and not due to market demand.  Such tethers were not backed by USD.  In addition, defendants did not maintain segregated reserve accounts of USD to back outstanding tethers, but rather intermingled reserve funds with funds used for other purposes, including self-dealing and the general corporate purposes of Bitfinex, Tether, and other related entities.

43.     Likewise, defendants' promise that investors would be able to redeem outstanding tethers was false.  Defendants have thrown up numerous roadblocks to prevent large scale tether redemptions.  These include size limits, residency limits, byzantine verification requirements, and prolonged periods in which even nominal redemption rights have been withdrawn.  Academic analysis, as detailed herein, has confirmed that tether flows are essentially unidirectional: billions of dollars' worth of tethers are issued and distributed throughout the cryptocurrency markets, while

hardly any have ever been redeemed.  In further evidence of this fact, the number of tethers issued and outstanding has consistently increased over time, even as the overall cryptocurrency market has experienced enormous crashes and contractions, as reflected in the following chart:[3]



### The Founding of Bitfinex and Tether

44.     All of the Individual Defendants joined Bitfinex as executive officers in 2013, shortly after its founding as a peer-to-peer bitcoin exchange.  Defendant van der Velde served as CEO, defendant Devasini served as CFO, and defendant Potter served as CSO.  As the most senior executive officers of Bitfinex, the Individual Defendants directed Bitfinex's operations, developed and implemented company strategy, determined Bitfinex's public messaging, and managed its day-to-day affairs.  Their direct influence and oversight of Bitfinex's activities as hands-on managers was, in part, due to the venture's small size.  For example, as late as 2016, Bitfinex had only six developers.

---

[3]     Indeed, the only sustained decrease in tether market capitalization occurred in October 2018, *when Bitfinex itself* took an estimated $630 million worth of tether out of circulation under suspect circumstances.

45.     In 2014, not long after taking the reins of Bitfinex, the Individual Defendants founded Tether.  Defendants Devasini and Potter set up Tether in the British Virgin Islands with the help of offshore services firm Appleby.  After assuming parallel executive roles at Tether, the Individual Defendants began managing strategy, operations, and day-to-day affairs the same as they had at Bitfinex.

46.     The Individual Defendants' roles as managers of the largest digital stablecoin and one of the largest cryptocurrency exchanges in the world raised serious conflicts of interest and enabled them to engage in the manipulative activities detailed herein.  For example, defendants funneled newly issued tethers through the Bitfinex platform to conceal their impact on bitcoin prices and to cash out bitcoin in USD.



47.     At first, defendants attempted to conceal the deep interconnections between Tether and Bitfinex because of the red flags such a conflicted relationship would have raised for investors and regulators.  For example, defendant Potter stated that Tether was a "completely segregated entity" and a "completely separate thing" from Bitfinex, that there were "no breaches" in that separation.  Defendant Potter further represented that the entities took "great pains to make sure"

that "everything there is 100% kosher."  Despite defendants' protestations, numerous facts have subsequently come to light (including those revealed in the Paradise Papers and in the NYAG Action) confirming that Bitfinex and Tether are inextricably intertwined.

48.    Tethers began trading in the secondary market in February 2015.  By May 2015, the number of tethers issued and in circulation had grown to 450,000, worth a purported $450,000 (given the promised 1:1 USD ratio).  The same month, Bitfinex announced a computer hack that resulted in the theft of 1,500 bitcoins worth approximately $400,000.  However, Bitfinex assured investors it would simply absorb the loss.

49.    In June 2016, the U.S. Commodities Futures Trading Commission ("CFTC") fined Bitfinex $75,000 for failing to register as a commodities exchange and for engaging in illegal commodities transactions, specifically in bitcoin.  The CFTC order made clear that bitcoins are commodities within the meaning of the CEA, and thus subject to the Act's regulations.

50.    In August 2016, Bitfinex claimed it had been hacked again, resulting in the loss of 120,000 bitcoins worth about $72 million.  The theft was one of the worst hacks in bitcoin history.  Bitfinex stated that it would generalize the losses by reducing its customers' account balances by 36% and by distributing new digital tokens that it had created, known as "BFX" tokens, to customers in proportion to their losses.  BFX tokens purportedly could be redeemed for equity shares of iFinex or for credit from the company.  Defendant Potter would later admit that many of the BFX tokens were, in fact, redeemed by Bitfinex in exchange for tethers.

51.    Following the hack, Bitfinex announced it would engage a blockchain forensic firm known as Ledger Labs to conduct a security audit.  In response to customer questions about the scope of the audit, Bitfinex initially claimed that Ledger Labs would also be conducting "an audit of our complete balance sheet for both cryptocurrency and fiat assets and liabilities."  However, in

April 2017, Bitfinex retracted the promise of a Ledger Labs financial audit, claiming instead that it was hiring a "reputable, third party accounting firm to audit our balance sheet."

**Defendants Refuse Transparency**

52.     The promised Ledger Labs audit was never performed, fitting defendants' well-worn pattern of promising financial transparency but refusing to follow through.  Tether's website proudly proclaims: "Tether is always fully transparent."  However, defendants have taken great pains to conceal their operations and hide their true activities from public scrutiny.  Notably, Tether has repeatedly broken promises to release the results of a professional third-party audit to the public.  The unwillingness to provide this modicum of financial transparency stands in stark contrast to representations in the Tether whitepaper that Tether was "undergo[ing] regular professional audits."  These statements, and other similar representations defendants made throughout the Class Period, were false.  Defendants have ***never*** shared the results of any professional audit with the public, assuming one has ever been undertaken.

53.     Tether has instead at various times provided investors with purported summaries of the currency holdings backing tethers.  For example, Tether claimed the Taiwanese-auditing firm TOPSUN CPAs & Co. conducted audits of its financials up until March 2017, but the results "were not in a form suitable for public consumption."  In their place, Tether released bank statement summaries purportedly certified by the firm that provided no indication whether defendants were creating and redeeming tethers pursuant to investor demand or maintaining dedicated tether reserves.

54.     Similarly, in September 2017, accounting firm Friedman LLP ("Friedman") issued a memorandum purportedly providing an analysis of Tether cash and token balances as of September 15, 2017.   The memorandum stated that Friedman had relied on numerous

representations made by Tether, specifically disclaimed that the firm had conducted an audit, and stated that the findings should not be relied on by anyone other than Tether management.  While the memorandum discussed a snapshot of accounts that purportedly belonged to Tether, it could not state where the currency holdings had come from, whether they were in fact funds backing issued tethers, or even whether Tether had access to the funds.  Tether's relationship with Friedman was terminated shortly thereafter, after both received subpoenas from the CFTC seeking information related to Friedman's work for the company.  At the time, Tether issued a statement that, "[g]iven the excruciatingly detailed procedures Friedman was undertaking for the relatively simple balance sheet of Tether, it became clear that an audit would be unattainable in a reasonable time frame."

55.     In June 2018, following the release of the Griffin and Shams paper (detailed below), Tether once again attempted to dispel investor concerns regarding its financials without conducting an actual audit.  It hired Freeh, Sporkin & Sullivan LLP ("FSS"), a law firm with prior connections to defendants' banking partner Noble Bank International, to review its account balances.  Once again, the review attempted to simply confirm the amount of USD held in accounts purportedly controlled by Tether at a particular point in time, without any analysis of how the money had entered the accounts or whether the funds were in fact dedicated to tether reserves.  FSS stressed it had not conducted an audit and was "not an accounting firm and did not perform [its] review and confirmations using Generally Accepted Accounting Principles."  Shortly thereafter, Tether's General Counsel Stuart Hoegner reportedly told *Bloomberg*: "***The bottom line is an audit cannot be obtained***."

56.     Despite repeatedly promising investors a reliable third-party audit, Tether has consistently reneged.  To date, no professional audit of Tether's finances using generally accepted

accounting standards has ever been disclosed to the public. Single-day account statements purportedly belonging to Tether are meaningless because, as detailed herein, any purported funds could just as likely reflect retroactive topping up of accounts, related-party assets or funds otherwise procured through defendants' market manipulation scheme.

57.     Defendants have also attempted to conceal the interconnections between Tether and Bitfinex and made numerous false representations to the market regarding the interplay between the companies, Tether's so-called "reserves," the ability of investors to redeem tethers, and numerous other issues designed to obfuscate defendants' true operations. Similarly, in the NYAG Action, defendants have refused to provide requested documents and information that would allow regulators to verify the legality of their market activities and confirm the claimed finances and financial transactions of Bitfinex and Tether. Defendants have strenuously fought to keep their internal documents secret, refusing to turn over documents called for by subpoenas issued by government agencies and seeking an emergency appeal of a trial court order requiring them to turn over materials to the NYAG's investigation.

58.     This lack of transparency has allowed defendants to covertly shift funds between Bitfinex, Tether, and employee-owned accounts and cover-up the market manipulation activities as detailed herein.

**Defendants Move to Shadow Banking**

59.     In March 2017, Tether and Bitfinex lost a critical banking relationship. Because the companies allow clients to deposit and withdraw U.S. dollars in exchange for virtual currencies, both Tether and Bitfinex hold large sums of U.S. dollars and must maintain relationships with banks that can reliably hold these funds and process client deposits and withdrawals, including banks that operate in the United States and service U.S. individuals. Until

March 2017, Wells Fargo fulfilled this function as correspondent for several Taiwanese-based banks that made and received wire transfers on behalf of Bitfinex and Tether.  However, on March 31, 2017, Wells Fargo unilaterally discontinued these services.

60.     On April 5, 2017, Tether and Bitfinex jointly sued Wells Fargo in U.S. District Court for the Northern District of California, asserting claims for intentional interference with contract.  The complaint revealed the banking relationships of Tether and Bitfinex were deeply interconnected.  For example, both companies used the same banks for essentially the same purposes and both suffered from losing Wells Fargo's services for essentially the same reasons.  The complaint described the loss of Wells Fargo as an "existential threat" to both businesses that would "completely cripple" them.  Notwithstanding these dire predictions, Tether and Bitfinex voluntarily dismissed the suit less than a week after it was filed.

61.     After the loss of Wells Fargo, Tether and Bitfinex pivoted to less regulated non-traditional financial partners and third-party payment processors.  These included a Puerto Rico-based entity named Noble Bank International ("Noble Bank") (a subsidiary of New York-based Noble Markets LL), the Bahamian Deltec Bank & Trust Limited, and a Panamanian entity called Crypto Capital Corp. ("Crypto Capital").  Tether and Bitfinex also employed a network of affiliated companies owned by Bitfinex/Tether executives and their associates to handle the transmittal of customer funds, yet never disclosed to investors that they were increasingly relying on this affiliated network or third-party payment processors to process customer transactions.

62.     As defendants moved their operations further outside of the traditional banking and financial world and into the shadows, defendants quickly discovered an opportunity to take advantage of the diminished oversight by generating hundreds of millions of dollars in illicit trading proceeds.  Defendants exploited their unique dual role as operator of one of the largest

cryptocurrency exchanges and the issuer of the most widely traded stablecoin to launch a massive scheme to manipulate the market for bitcoin.  As defendant Potter would later describe defendants' off-the-grid banking activities:

> Being in the bitcoin business is really about playing cat and mouse with the correspondent banks.  The problem with becoming big . . . is that we can't fly under the radar anymore.

63.     Indeed, it is telling that defendants began issuing *billions* of dollars' worth of tethers at the same time that they had lost their critical U.S. banking relationship, despite the fact that they had previously claimed this relationship was necessary to process even the relatively modest sums of previously issued USDT.  However, the discrepancy makes perfect sense if the creation of the new tethers was primarily due to illegitimate market activity and not investor demand.  As explained below, this is precisely what occurred.

**Defendants Successfully Manipulate the Price of Bitcoin**

64.     In December 2012, defendant Devasini posted on a bitcoin user forum with the pseudonym "urwhatuknow."  He observed that "[i]lliquid markets, such as Bitcoin are easy prey to manipulation."  He described how this manipulation would work:

> The principle is to draw attention by buying a pretty big quantity (compared to the daily number being bought and sold) and once this attention is drawn, more and more people will start buying trying to jump on the bandwagon and trying not to miss the train.

65.     This statement would prove portentous.  In March 2017, defendants embarked on an ambitious and ultimately successful scheme to manipulate the price of bitcoin remarkably along the lines that defendant Devasini had earlier described.  The scheme worked as follows: Defendants issued massive amounts of tether, often worth tens or even hundreds of millions of dollars at a time.  The tethers would not be issued pursuant to investor demand, but simply printed by defendants at their leisure.  These tethers were deposited in defendant-controlled accounts at

their captured trading platform, Bitfinex, where they were then funneled to accounts on other cryptocurrency exchanges (such as Poloniex or Bittrex) and used to purchase massive quantities of bitcoin.  The sudden influx of large buy orders for bitcoin drove up the price of bitcoin, as defendants specifically intended, leading to artificial price inflation.  Momentum traders magnified the price effect of defendants' large buy orders, as did the timing of their trades, which were generally carried out when bitcoin prices were lagging or around price floors.  The systemic, coordinated injection of artificial bitcoin demand throughout the Class Period resulted in persistent upward pricing pressure and sustained artificial price inflation in the bitcoin market.

66.    In short, defendants used their market power to create artificial demand for bitcoin essentially out of nothing.  Once the price of bitcoin was manipulated upward, defendants cashed out by converting bitcoin into USD at artificially inflated prices.  These sales occurred at a slower pace, in smaller blocks and through more discrete channels as compared to the buy orders in order to maintain the artificial price inflation.  Defendants could then use the USD for whatever purpose they so desired, including self-dealing, covering up lost investor funds, inter-corporate payments, or even retroactively topping up accounts they could later claim held USD tether reserves.

67.    The following example of defendants' market manipulation of bitcoin's price will illustrate the scheme's widespread effect.  On November 8, 2017, 20 million USDT were released shortly before a single market buy of approximately $13.5 million USD worth of bitcoin.  The sudden spike in buying pressure quickly drove the price of bitcoin from $7,075 to $7,350, a 4% increase in *less than 60 minutes*.  This issuance added to a $20 million tether issuance from the prior day.  Defendants next issued $30 million worth of tether on November 10, 2017; $30 million worth of tether on November 11, 2017; $20 million worth of tether on November 16, 2017; and $30 million worth of tether on November 17, 2017.  In total, defendants issued *$150 million* worth

of tether in just ten days.  During this same time span, the price of bitcoin rose from about $7,000

per bitcoin to over $8,000 per bitcoin, a 14% price increase.

68.     The following chart illustrates the run up in bitcoin prices during the Class Period

and the correlation with massive tether issuances:



69.     Defendants' scheme was a success.  Between March 7, 2017 and January 2018,

more than *$2.2 billion* worth of tethers was issued – a *36,500%* increase over the amount issued

by defendants during all of 2016.  This exponential increase in the amount of tethers issued and

outstanding occurred despite defendants' previous predictions that the loss of Wells Fargo posed

an "existential threat" that would "completely cripple" Bitfinex and Tether.  Without a U.S.

banking partner, it would be practically impossible for Tether to process the large volumes of USD

needed to issue and redeem tethers if such tethers were actually being generated due to investor

demand.  But this would pose no obstacle if the large increase of tethers was not due to investor

demand and the deposit of actual USD, but due to defendants' manipulative scheme to issue new

tethers at their leisure.  That is precisely what occurred.  Far from diminishing the prospects of

Bitfinex and Tether, the loss of a legitimate banking relationship had, in fact, allowed defendants' illicit activities to flourish.

70.     By the end of 2017, the price of bitcoin had climbed to **_over $19,000_**, from only about $1,000 in January 2017.  The following chart illustrates this meteoric rise:



71.     Then, on or about January 24, 2018, an anonymous analyst published an online report (the "Tether Report") entitled "Quantifying the Effect of Tether."  According to the author:

> The price data suggests that [t]ether may not be minted independently of bitcoin price and may be created when Bitcoin's falling; it also rejects the notion that [t]ether is not having a great influence on the bitcoin price.  One interpretation of the data suggests that **_[t]ether could account for nearly half of bitcoin's price rise_**, not even allowing for follow-on effects and the psychological effects of rallying the market repeatedly.  The transaction data could trigger extreme scrutiny and audits due to a questionable pattern of transactions.

72.     Around the same time, defendants' rapid-fire issuance of large blocks of tethers that began in March 2017 abruptly and temporarily ceased.  Defendants would not issue another large block of tethers until March 2018.

73.     Suspicion of defendants' trading activities gained momentum after the publication of a detailed academic study at the University of Texas's Austin McCombs School of Business

several months later.  In June 2018, Professor John Griffin and then-PhD candidate Amin Shams (later an instructor at The Ohio State University Fisher College of Business) released a paper titled "Is Bitcoin Really Un-Tethered," which provided overwhelming evidence that tether had been printed by defendants in order to drive up the price of bitcoin during its historic bull run.  Indeed, Griffin and Shams ultimately concluded that an estimated ***58.8%*** of the rise of bitcoin during 2017 and early 2018 was associated with market manipulation activities involving the issuance of tether, rather than legitimate market price accretion.

74.     Griffin and Shams collected and analyzed data on popular cryptocurrency blockchains to measure the potential impact of tether issuances on bitcoin prices and to study the flow of cryptocurrencies across major exchanges, including Bitfinex.  They found that large blocks of tether were created exclusively on the Bitfinex exchange, totaling more than $2 billion, and then moved out to other popular exchanges, such as Poloniex and Bittrex.

75.     The central question of Griffin and Shams' paper was whether tethers were being issued in response to legitimate investor demand or whether they were being illegitimately created in order to foment artificial price increases in the bitcoin market.  The pair found overwhelming evidence that tether was "being pushed out onto the market and not primarily driven by investors' demand."  First, they observed that after tether is printed, in periods of negative bitcoin returns large amounts of tether flow from Bitfinex to other exchanges in order to purchase significant quantities of bitcoins.  This flow is unidirectional – "***almost no [t]ether returns to the [t]ether issuer to be redeemed***" – confirming that defendants were not allowing large scale tether redemptions, but rather, were pushing tethers into the market in a one-way proposition.  Although there may be some "legitimate demand for [t]ether," Griffin and Shams found that "[those] do not

happen to be the ones that dominate the flow patterns observed in the data."  The following chart illustrates this flow network:



Figure 1. Aggregate Flow of Tether between Major Addresses. This figure shows the aggregate flow of Tether between major exchanges and market participants, from Tether genesis block to March 31, 2018. Tether transactions are captured on the Omni Layer as transactions with the coin ID 31. The data include confirmed transactions with the following action types: Grant Property Tokens, Simple Send, and Send All. Exchange identities on the Tether blockchain are obtained from the Tether rich list. The thickness of the edges is proportional to the magnitude of the flow between two nodes, and the node size is proportional to aggregate inflow and outflow for each node. Intra-node flows are excluded. The direction of the flow is shown by the curvature of the edges, with Tether moving clockwise from a sender to a recipient.

76.     Second, Griffin and Shams discovered that this tether flow was strongly correlated with rising bitcoin prices.  The effect was not observed when bitcoins flowed to other major exchanges, but only Bitfinex, which "strongly suggests that the price effect is driven by [t]ether issuances."  Indeed, the "Bitcoin reversal did not exist before [t]ether was prevalent in the market and disappears during the period when [t]ether stops being printed."  The researchers also observed that the issuance of tether and purchase of bitcoins was occurring around price floors, consistent with attempts "to stabilize and drive up the price" of bitcoin.  The pair conducted a regression analysis that provided "even stronger" results indicating that "[t]ether flows are causing the positive Bitcoin return."  The results all pointed to an inescapable conclusion, that "***[t]ether has a significant impact on the cryptocurrency market***" and was being "***used both to stabilize and manipulate Bitcoin price.***"

77.     Griffin summarized his findings in an interview with *Bloomberg*:

First, [USDT] are created by the parent company Tether Ltd., often in large chunks such as 200 million.  Almost all new coins then move to Bitfinex.  When bitcoin prices drop soon after the issuance, [USDT] at Bitfinex and other exchanges are used to buy bitcoin in a coordinated way that drives the price.

78.     Griffin and Shams' analysis substantiated the growing body of evidence that defendants' issuance of tethers was being used to manipulate bitcoin prices upwards.  According to Griffin and Shams' extensively researched report, the upward price effect of tether issuances was strongly correlated with upward swings in the price of bitcoin and supported by ample additional indicia of price manipulation.  Conversely, there was little evidence that the price movements in bitcoin were not impacted by manipulative activities tied to the issuance of tether, that the correlations had innocent explanations, or that the extensive data analyzed by Griffin and Shams were the product of random events.  The paper also aligned with the earlier analysis of the Tether Report, which likewise found that there was evidence that tether was being issued to manipulate the price of bitcoin upward, resulting in an estimated 50% price inflation.

79.     The following chart depicts the correlation of tether issuances and the run up in the price of bitcoin:



80.     After reviewing Griffin and Shams' article, Dr. Gerard Martinez, the founder of crypto data analysis website CryptoDatum.io, agreed that "statistics support the theory that Tether Limited and Bitfinex corporations used [t]ether to buy bitcoin in key occasions during the meteoric rise of bitcoin prices of 2017 and beginnings of 2018."  Dr. Martinez concluded that the "statistics support the theory that Tether Limited and Bitfinex corporations used [t]ether to buy bitcoin in key occasions during the meteoric rise of bitcoin prices of 2017 and beginnings of 2018"; that "[t]hese corporations would print [t]ether right after transient bitcoin price dips"; that "Tether Ltd. would then buy bitcoin with the freshly minted [t]ether and would promote the creation of a fraudulent bullish market, which would attract more investors to buy bitcoin, contributing this way to increase the bubble (momentum effect)"; and then as the penultimate "part of the strategy . . . Tether Ltd. would send the freshly bought bitcoin to their accounts in Bitfinex."

81.     On October 28, 2019, Griffin and Shams' paper was published in the peer-reviewed *Journal of Finance*, one of the world's premiere finance journals.  The updated paper provided additional evidence that tether was being used to manipulate the bitcoin market.  The authors measured the price impact of the top 1% of hours with the largest lagged combined bitcoin and

tether flows on the two blockchains from March 2017 to March 2018.  These 95 hours were found to exhibit large negative returns before the flows, but large positive returns afterwards.  This 1% of the time series was associated with a staggering ***58.8%*** of bitcoin's compounded return.  Griffin and Shams performed additional bootstrap and placebo analyses to confirm that "this behavior does not occur randomly."

82.     A shocking further revelation from Griffin and Shams' paper is that the pushing of tethers to foment artificial bitcoin demand was being carried out by a ***single large account*** on the Bitfinex platform.  The pair found that the 1%, 5% and 10% of hours with the highest lagged flow of tether by this trading whale was associated with 55%, 67.2% and 79.2% of bitcoin's price increases during the time period, respectively.  They continued:

> By mapping the blockchains of Bitcoin and [t]ether, ***we are able to establish that one large player on Bitfinex uses [t]ether to purchase large amounts of Bitcoin when prices are falling and following the printing of [t]ether.  Such price supporting activities are successful***, as Bitcoin prices rise following the periods of intervention.  Indeed, even 1% of the times with extreme exchange of [t]ether for Bitcoin have substantial aggregate price effects.

> This pattern is not present for the flows to any other [t]ether exchanges, and simulations show that these patterns are highly unlikely to be due to chance; this one large player or entity either exhibited clairvoyant market timing or exerted an extremely large price impact on Bitcoin that is not observed in the aggregate flows from other smaller traders.  ***Such a trading pattern by this one player is also large enough to induce a statistically and economically strong reversal in Bitcoin prices following negative returns.***

83.     The paper found that the overwhelming evidence was "consistent with [t]ether being printed unbacked and pushed out onto the market, which can leave an inflationary effect on asset prices" and "that Bitcoin prices are subject to gaming by a small number of actors."

84.     In an interview with *The Wall Street Journal*, Professor Griffin confirmed the manipulator had to be either Bitfinex or "somebody they do business with very frequently."  As *The Wall Street Journal* reported, the evidence put forward by Griffin and Shams "strongly

suggests Bitfinex executives either knew of the scheme or were aiding it."  Available corroborating facts detailed herein place defendants at the epicenter of the scheme.

85.     Without court intervention, the defendants have been allowed to run their scheme unabated.  In October 2019, cryptocurrency research firm TokenAnalyst issued a report affirming Tether's issuance of USDT correlated with upward bitcoin price movement over the course of 2019.  TokenAnalyst analyzed the "relationship between $BTC price and $USDT supply over the course of history" and determined that "on days where  #USDT ERC20 is minted, 70.0% of the time the price of BTC moves up," and "on days where #USDT Omni is minted, 50.0% of the time the price of BTC moves up."

86.     Unfortunately the market for bitcoin has been manipulated in a similar manner before, demonstrating its susceptibility to the type of manipulation occurring in this case.  In November and December 2013, the price of bitcoin skyrocketed from $200 to over $1,200 per bitcoin.  It would later be revealed that autonomous trading "bots" had contributed to the massive rise in value by purchasing bitcoins to push the price upwards.  The most prominent of these bots, dubbed the "Willy Bot," was secretly being run by insiders at the primary bitcoin exchange at the time, Mt. Gox, and being used to prop up bitcoin prices.  Much like the market manipulation in this case, the operators used their control of the Mt. Gox exchange to allow the Willy Bot to fraudulently "buy" bitcoin without paying for them - *i.e.*, to create artificial demand and sustained upward pricing pressure.  In early 2014, Mt. Gox imploded after revealing that hundreds of millions of dollars' worth of bitcoin had mysteriously disappeared from the exchange.  Its CEO, Mark Karpeles, was subsequently convicted on various counts of abusing his position, including data manipulation.

87.    Ominously, in July 2014, soon after the reporting of the Willy Bot's existence broke, defendant Devasini essentially admitted that he was devising a similar scheme. Responding to an online chat requesting that he "get a willy bot like Karpeles already and take us to 10,000" (referring to the price of bitcoin), defendant Devasini responded under his urwhatuknow pseudonym that he was "*[c]urrently working on it.*" This scheme would manifest in the market manipulation activity detailed herein.

**Defendants Raid Tether Reserves**

88.    Although defendants have offered blanket denials in response to the overwhelming evidence of market manipulation, they have failed to actually refute any specific factual allegations. To the contrary, a later-revealed episode involving defendants' misappropriation of at least $700 million in tether reserves confirmed many of the essential facts of their market manipulation scheme, including, *inter alia*, that: (i) defendants have sufficient market power to impact the price of bitcoin; (ii) hundreds of millions of dollars in assets flow seamlessly between Bitfinex and Tether without effective controls or oversight; (iii) tether reserves are not segregated, but co-mingled within corporate slush funds; (iv) defendants have systematically used tether funds to purchase bitcoin; (v) tether is not actually backed 1:1 by the U.S. dollar; (vi) defendants have misrepresented their business and operations to the investing public; and (vii) defendants routinely engage in conflicted and self-interested transactions.

89.    Throughout the Class Period, defendants worked closely with the Panamanian payment processor Crypto Capital. Although Bitfinex had been doing business with Crypto Capital since at least 2014, their transactional relationship grew steadily after Wells Fargo's departure and Tether and Bitfinex were forced into shadow banking relationships in order to process the hundreds of millions of USD as detailed above. The ramping up of relations with Crypto Capital also corresponded with the dramatic rise in the issuance of tether beginning in

March 2017.  By 2018, Bitfinex had placed over $1 billion of co-mingled customer and corporate funds with Crypto Capital.  Despite this large volume of funds, no contract or similar agreement was ever entered into between Crypto Capital and Bitfinex or Tether.

90.     By mid-2018, Bitfinex was having extreme difficulty honoring its clients' requests to withdraw their money from the trading platform.  The true reason was known only to Bitfinex: Crypto Capital, now a substantial depository of Bitfinex funds, was refusing to process customer withdrawal requests and failing to return requested funds.  In one interaction between the companies, a senior Bitfinex executive wrote to an individual at Crypto Capital, saying "sorry to bother you every day, is there any way to move at least 100M to either [REDACTED] We are seeing massive withdraws and we are not able to face them anymore unless we can transfer some money out of Cryptocapital."

91.     By early October 2018, rumors began circulating online that Bitfinex was facing insolvency, as clients reported difficulty in withdrawing funds from the Bitfinex trading platform.  On October 7, 2018, Bitfinex published a notice to investors ensuring them that the company was not insolvent and that rumors to that effect were "a targeted campaign based on nothing but fiction."  The notice continued:

> [W]e do not entirely understand the arguments that purport to show us to be insolvent without providing any explanation about why.
>
> [V]erified Bitfinex users can freely withdraw Euros.  Japanese Yen, Pounds Sterling, and U.S. Dollars.  Complications continue to exist for us in the domain of fiat transactions, as they do for most cryptocurrency related organizations.
>
> Stories and allegations currently circulating mentioning an entity called Noble Bank have no impact on our operations, survivability, or solvency.

92.     Similarly, on October 15, 2018, Bitfinex published a notice claiming that "it is important for us to clarify that: **All cryptocurrency and fiat withdrawals** are, and have been,

- 35 -

processing as usual without the slightest interference . . . .   **All fiat** (USD. GBP. JPY, EUR)
**withdrawals** are processing, and have been, as usual."  (Emphasis in original.)

93.    These statements were false.  At the time, Bitfinex was having extreme difficulty
processing withdrawals because of issues accessing funds held at Crypto Capital.  Indeed, ***the very
same day*** as defendants' false and misleading notice, a senior Bitfinex executive (later identified
as defendant Devasini) emailed his Crypto Capital counterpart, stating that "dozens of people are
now waiting for a withdrawal out of Crypto Capital. . . .  I need to provide customers with precise
answers at this point, can't just kick the can a little more."  He implored Crypto Capital to "please
understand this could be extremely dangerous for everybody, the entire crypto community  . . .
***BTC could tank to below 1k if we don't act quickly***."  This exchange evinces Bitfinex's internal
acknowledgment that defendants' actions had a direct impact on the market price for bitcoin.

94.    Similarly, two days later, on October 17, 2018, defendant Devasini again wrote
Crypto Capital, imploring: "I need urgently some funds . . . either [t]ethers or USD, we need at
least 100M within the next week . . . the situation looks bad[.]   [W]e have more than 500
withdrawals pending and they keep coming in."  Again, a day later, he stated that "we have about
400 small wires pending, the total amount is only 5M, but we have to send them out quickly[.]
People are enraged . . . too much money is trapped with you and we are currently walking on a
very thin crust of ice . . . I hope you will be able to send something big pretty soon.  [T]he situation
is not looking good."

95.    By November 2018, defendants were growing increasingly desperate and
concerned.  Defendant Devasini again emailed Crypto Capital stating that "it's always very
difficult to tell our customers something real and this fuels the uncertainty."  He continued, "I think
you should stop playing and tell me the truth about what is going on."  The amount of missing

customer funds exceeded ***$850 million*** (including at least $23 million from just one New York-based client).

96.     Crypto Capital claimed the reason it could not return the money was that the funds had been seized by government authorities in Portugal, Poland, and the United States.  Defendants rejected this excuse, believing that Crypto Capital may have simply stolen the funds.[4]

97.     To conceal the loss of investor funds, defendants orchestrated an exchange of funds between Tether and Bitfinex.  In November 2018, defendants secretly transferred $625 million from Tether accounts, including funds purportedly dedicated to tether reserves, to accounts for Bitfinex.  In exchange, Bitfinex provided a corresponding amount of its assets to Tether, despite the fact that these assets had been impaired by the Crypto Capital debacle.  The purpose of this exchange was to allow Bitfinex to address liquidity issues unrelated to tethers and to covertly shift the risk of loss from Bitfinex to Tether.  This same month, despite the loss of Bitfinex funds and the transfer of Tether assets to cover the shortfall, Tether publicly declared that "***USDT in the market are fully backed by US dollars that are safely deposited in our bank accounts***."  As with many of defendants' public representations, this statement was false and misleading and made in furtherance of defendants' market manipulation scheme.

98.     Defendants never publicly disclosed the loss of $850 million in investor funds, choosing instead to cover up the shortfall.  In December 2018, defendants put in place a plan to shift up to $900 million of tether reserves to Bitfinex in order to maintain investor liquidity on the exchange.  Defendants internally characterized the transaction as a "loan" of up to $900 million that was "secured" by 60,000 iFinex shares owned by DigFinex.  At least $700 million in investor

---

[4]    The U.S. Department of Justice ("DOJ") would later indict two individuals associated with Crypto Capital, charging them with bank fraud and conspiracy in connection with their provision of shadow banking services to Bitfinex.  *See U.S. v. Fowler*, 1:19-cr-00254 (S.D.N.Y.).

funds (including a reclassification of the previously exchanged $625 million) were shifted from Tether to Bitfinex pursuant to this plan.

99.     Defendants' "loan" was a sham transaction.  DigFinex was owned and operated by the same individuals that owned and operated Bitfinex and Tether, including the Individual Defendants.  Wrought with inherent conflicts of interest, the transaction documents were signed on behalf of Bitfinex and Tether by the same individuals.  The conflicted transaction served only to illustrate defendants' ability to seamlessly shift hundreds of millions of dollars in assets between Tether and Bitfinex, to prop up bitcoin prices, to mislead the market, and to pilfer tether "reserve" funds.

100.    Until February 2019, Tether's website continued to represent that every USDT in circulation was "backed 1-to-1, by traditional currency held in our reserves.  So 1 USDT is always equivalent to 1 USD."  Facing criminal investigations by the DOJ, the CFTC and the NYAG, Tether quietly changed its stance in March 2019 by claiming every USDT is "1-to-1 pegged to the dollar" because it is "100% backed" by reserves that include "other assets" – such as receivables from loans to third parties.  Tether changed its terms of service to state that tethers were backed, not by USD, but rather by the company's "reserves," an amorphous term defined to include "traditional currency and cash equivalents," as well as ***other assets and receivables from loans made by Tether to third parties, which may include affiliated entities*."  Thus, as defendants have admitted, tethers are not backed one-to-one by USD, but rather backed, if at all, by a nondescript basket of currencies, cash equivalents, assets, and IOUs from affiliated parties.  Defendants have given themselves carte blanche discretion to determine what constitutes tether "reserves," which may even include "loans" to themselves and their affiliated companies.  Despite the radical

departure from defendants' prior representations to investors, Tether instituted this change with little fanfare.

101.    On April 25, 2019, the NYAG filed an *ex parte* application in the NYAG Action seeking the production of documents and to enjoin Tether and Bitfinex from further illegal transfers of customer funds and fraudulent activities.  Soon after the news of the NYAG's lawsuit broke, the price of bitcoin fell nearly 10%, once again confirming the correlation between the perceived market value of tethers and the price of bitcoins.

102.    In addition, the NYAG has charged defendants with misappropriating up to $700 million worth of tether reserves, raiding these funds to cover an undisclosed investor shortfall at Bitfinex.  These misappropriated funds represented ***more than 30%*** of all purported tether reserves as of January 2019.  In response, defendants have admitted the essential facts of the scheme (although disputing its characterization) and disclosed that, despite their false assurances to the contrary, tether reserve funds have been inextricably intermingled with other assets.  For example, a May 13, 2019 letter from defendants' counsel claimed that defendants could not separate out tether reserve funds from other funds used by Bitfinex and Tether because "[m]oney is fungible" and therefore "***determining whether payments are from reserves or not is fraught with ambiguity***."  Of course, this ambiguity only exists because defendants have failed to segregate tether reserves into a dedicated account, rather than their own slush fund.  In court, defendants have also admitted that funds pass freely between Bitfinex and Tether and that defendants have used tether reserve funds to buy bitcoin.  Thus, defendants have used selective and limited financial reporting to further conceal their manipulative activities and cause additional harm to investors. The NYAG Action is proceeding apace, and New York Supreme Court Justice Joel Cohen has found that Tether and Bitfinex are subject to personal jurisdiction in the United States and ordered

the production of documents to assist in the NYAG investigation.  Defendants have fought this order, refused to turn over the requested documents, and sought an interlocutory appeal to challenge the trial court's decisions.

103.    From 2017 through 2018, Tether printed 2.8 billion USDT in order to inflate the demand for cryptocurrencies so prices would artificially swell.  According to one *Bloomberg* report, the resulting rally created the biggest asset bubble ever recorded, as illustrated by the following chart:



104.    When the bubble burst, however, bitcoin investors lost hundreds of millions of dollars.  The price of bitcoin plummeted 65% in January and February 2018 alone.  By the end of 2018, the price of bitcoin fell to little more than $3,000, an approximately 85% plunge from its Class Period high.  These price declines have led to devastating financial losses for investors.

105.    As a result of defendants' manipulative scheme to artificially inflate the price of bitcoin during the Class Period, plaintiff and the Class suffered actual economic losses and damages.

## CLASS ACTION ALLEGATIONS

106.    Plaintiff brings this action on behalf of a class consisting of all those who purchased bitcoin during the Class Period and who were damaged by defendants' price manipulation scheme (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of Tether and/or Bitfinex, at all relevant times, members of their immediate families, and defendants' legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

107.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, bitcoin was actively traded on Bitfinex and other cryptocurrency exchanges.  Millions of dollars' worth of bitcoin traded daily on average throughout the Class Period by hundreds if not thousands of Class members.

108.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

109.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and market manipulation litigation.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)              whether the CEA was violated by defendants' acts as alleged herein;

      (b)              whether the federal antitrust statutes were violated by defendants' acts;

      (c)              whether defendants manipulated the price of bitcoin during the Class Period;

(d)        whether the price of bitcoin was artificially inflated during the Class Period; and

(e)        to what extent the members of the Class have sustained damages and the proper measure of damages.

111.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of the CEA (7 U.S.C. §1, *et seq.*)
### Manipulation
### Against All Defendants

112.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

113.    By their intentional misconduct, defendants violated the CEA, specifically 7 U.S.C. §§6b(a), 6c(a), 9(3), 13(a)(2), 25(a), and CFTC rules adopted under the CEA (17 C.F.R. §180.2), and caused prices of bitcoin to be artificial during the Class Period.

114.    Defendants' activities alleged herein constitute market manipulation of prices of bitcoin in violation of 7 U.S.C. §§6b(a), 6c(a), 9(3), 13(a)(2), 25(a), and 17 C.F.R. §180.2.

115.    Defendants possessed and exercised an ability to manipulate bitcoin market prices through the manipulative schemes described above.  Defendants directly and indirectly caused artificial prices in the bitcoin market through their manipulative activities.  They did so by, *inter alia*, issuing tethers out of proportion with investor demand, converting tethers to bitcoin in quantities sufficient to drive up the prices of bitcoin, cashing out bitcoin at inflated prices,

concealing business entanglements and asset transfers between Tether and Bitfinex, and misleading the public.

116.    Defendants specifically intended to cause the artificial bitcoin prices.  Defendants reaped massive windfalls from the profits of their scheme, which allowed them to sell bitcoins at artificially inflated prices, collect additional fees from the Bitfinex exchange, use tether "reserves" as part of company slush funds, and conceal the loss of investor assets.

117.    Defendants' manipulation deprived the Class of a lawfully operating bitcoin market during the Class Period.

118.    Plaintiff and other members of the Class transacted at artificial and unlawful prices resulting from defendants' manipulations in violation of the CEA, 7 U.S.C. §1, *et seq*., and Rule 180.2, and as a direct result thereof were injured and suffered damages.  Plaintiff sustained and is entitled to actual damages for the violations of the CEA alleged therein.

### COUNT II

**For Violation of the CEA (7 U.S.C. §§9 and 25 and
CFTC Regulation 180.1(a) (17 C.F.R. §180.1(a)))
Use of a Manipulative or Deceptive Device or Contrivance
Against All Defendants**

119.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

120.    Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§9 and 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate not later than one year after July 21, 2010, the date Dodd-Frank was enacted. 7 U.S.C. §§9 and 25.

121.    The CFTC timely promulgated Rule 180.1, 17 C.F.R. §180.1. Rule 180.1 (17

C.F.R. §180.1(a)) makes it

> unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

122.    Defendants violated Rule 180.1(a) by, *inter alia*, communicating false information about USDT being backed 1:1, using this unbacked USDT to purchase bitcoin and sustain false price floors, and otherwise misrepresenting the demand for USDT, bitcoin, and other cryptocurrencies by issuing unbacked USDT and using it to execute manipulative trades on, at least, the Bitfinex exchange. These acts were an illegitimate part of the supply-demand equation, prevented true price discovery, and caused artificial pricing in the cryptocurrency market.

## COUNT III

### For Violation of the CEA (7 U.S.C. §2(a)(1)(B))
### Principal-Agent Liability
### Against All Defendants

123.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

124.    Each defendant is liable under the CEA (7 U.S.C. §2(a)(1)(B)) for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

125.    The Class sustained and is entitled to actual damages for the violations of the CEA alleged herein.

## COUNT IV

**For Violation of the CEA (7 U.S.C. §25(a)(1))**
**Aiding and Abetting Liability**
**Against All Defendants**

126.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

127.    Each defendant is liable under the CEA (7 U.S.C. §25(a)(1)) for aiding and abetting the manipulation of bitcoin prices during the Class Period.

128.    The Class sustained and is entitled to actual damages for the violations of the CEA alleged herein.

## COUNT V

**For Violation of the Sherman Antitrust Act §2 (15 U.S.C. §2)**
**Unlawful Competition**
**Against the Tether Defendants**

129.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

130.    A party injured by a violation of 15 U.S.C. §2 has standing to bring a civil action for relief under 15 U.S.C. §15.

131.    Tether controls more than 80% of the market for stablecoins in the United States and the world.  It has been estimated that 75% of all bitcoin transactions are carried out with tethers.  Tether therefore has monopoly power over the stablecoin and bitcoin markets.

132.    The Tether Defendants' monopoly power allows them to raise prices and exclude competition within the bitcoin and stablecoin markets.

133.    The Tether Defendants have issued massive amounts of unbacked USDT to flood the stablecoin market with USDT so as to willfully maintain their monopoly on the market and exclude competition and manipulate the bitcoin market.

134.    Their issuance of unbacked USDT was designed to gain greater market share so the Tether Defendants could eliminate stablecoin competition and maintain pricing control over the bitcoin and stablecoin markets.

135.    The Tether Defendants' actions have actually harmed competition, consumers, and members of the Class by decreasing consumer choice for other stablecoins and fraudulently manipulating the price of bitcoin and other cryptocurrencies.

136.    As a result of the Tether Defendants' abusive actions, plaintiff and members of the Class suffered economic damages, including compensatory and consequential damages.

## COUNT VI

### For Restitution/Disgorgement/Unjust Enrichment
### Against All Defendants

137.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

138.    It would be inequitable for defendants to be allowed to retain the benefits that defendants obtained from their illegal manipulative acts and other unlawful conduct described herein, at the expense of plaintiff and the Class.

139.    Plaintiff and Class members are entitled to the establishment of a constructive trust impressed upon the benefits to defendants from their unjust enrichment and inequitable conduct.

140.    Alternatively or additionally, each of the defendants should pay restitution of their own unjust enrichment to plaintiff and members of the Class.

## COUNT VII

### For Permanent Injunctive Relief
### Against the Bitfinex Defendants and the Tether Defendants

141.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein and, to the extent necessary, pleads this final cause of action in the alternative.

142.    Permanent and irreparable injury will result unless the Tether Defendants and the Bitfinex Defendants are permanently stopped from issuing unbacked USDT and/or using USDT and the Bitfinex exchange to manipulate the prices of bitcoin.

143.    Accordingly, plaintiff seeks permanent and injunctive relief prohibiting this practice.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B.    Declaring that defendants violated the CEA and awarding plaintiff and the Class compensatory and exemplary damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.    Declaring that plaintiff has antitrust standing and that the Tether Defendants violated the Sherman Antitrust Act, and awarding plaintiff and the Class compensatory and exemplary damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

- 47 -

D.      Declaring that plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed upon the benefits to defendants (jointly and severally) from their unjust enrichment and inequitable conduct;

E.      Ordering a constructive trust temporarily, preliminarily, permanently or otherwise on defendants' unjust enrichment (jointly and severally), including the portions thereof that were obtained at the expense of plaintiff and the Class;

F.      Enjoining the Tether Defendants and the Bitfinex Defendants from issuing unbacked USDT and/or using USDT and the Bitfinex exchange to manipulate the prices of bitcoin;

G.      Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

H.      Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 16, 2019          ROBBINS GELLER RUDMAN & DOWD LLP
                                  SAMUEL H. RUDMAN


                                  _____
                                        */s/Samuel H. Rudman*
                                       SAMUEL H. RUDMAN

                                  58 South Service Road, Suite 200
                                  Melville, NY  11747
                                  Telephone:  631/367-7100
                                  631/367-1173 (fax)
                                  srudman@rgrdlaw.com

                                  ROBBINS GELLER RUDMAN & DOWD LLP
                                  BRIAN E. COCHRAN
                                  200 South Wacker Drive, 31st Floor
                                  Chicago, IL  60606
                                  Telephone:  312/674-4674
                                  312/674-4676 (fax)

LAW OFFICE OF GEORGE W COCHRAN
GEORGE W COCHRAN
1385 Russell Drive, Suite B
Streetsboro, OH  44241
Telephone:  330/607-2187

Attorneys for Plaintiff